Argued and submitted November 26, 2019, affirmed April 21, 2021

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JACOB E. JASPERSE,
aka Jacob Ezra Jasperse,
*Defendant-Appellant.*

Multnomah County Circuit Court
16CR21774; A166572

487 P3d 402

Defendant appeals his convictions after a jury trial and unanimous verdicts on six counts each of first-degree sodomy and first-degree sexual abuse, one count of strangulation, and one count of second-degree criminal mistreatment. The victim was defendant's then seven-year-old daughter, J. Defendant denied committing the acts. He assigns error to two rulings excluding evidence that he asserts would have assisted the jury to determine whether J's report of sexual abuse was truthful and to the trial court's denial of a motion for mistrial after juror misconduct. *Held*: Where there was adequate other evidence from which the jury could assess the victim's credibility, the trial court did not abuse its discretion under OEC 403 in excluding the disputed evidence, which was relevant but cumulative and of little probative value. Any error in excluding the evidence was not prejudicial, because it was unlikely to have affected the verdict. In response the jury misconduct, the court took appropriate remedial action and did not abuse its discretion in denying defendant's motion for mistrial.

Affirmed.

Katharine von Ter Stegge, Judge.

Anne Fujita Munsey, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Carson L. Whitehead, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Tookey, Presiding Judge, and Aoyagi, Judge, and Sercombe, Senior Judge.

TOOKEY, P. J.

Affirmed.

**TOOKEY, P. J.**

Defendant appeals his convictions after a jury trial and unanimous verdicts on six counts each of first-degree sodomy and first-degree sexual abuse, one count of strangulation, and one count of second-degree criminal mistreatment. The victim was defendant's then seven-year-old daughter J. Defendant denied committing the acts. He assigns error to two rulings excluding evidence that he asserts would have assisted the jury to determine whether J's report of sexual abuse was truthful and to the trial court's denial of a motion for mistrial after juror misconduct.[1] As explained below, we reject defendant's assignments and affirm his convictions.

Defendant has a history of domestic violence. In March 2015, to stop her from crying, defendant choked J until she passed out. In J's presence, defendant punched his wife—J's mother—in the eye and threatened her with a knife. In April 2015, defendant attacked his wife with a sword. That event led the Department of Human Services (DHS) to take custody of J and her brother. The children were placed with their paternal grandparents.

In May 2015, J sat for a CARES Northwest interview relating to DHS's concerns about domestic violence, physical abuse, and neglect. J described domestic abuse by defendant toward her mother and marijuana use by her mother and grandparents. The interviewer asked J whether she had ever experienced sexual abuse, and she answered no.[2]

Defendant had supervised visits with the children, which J knew were scheduled to increase in frequency. The

---

[1] Defendant also assigns error to the trial court's giving of a nonunanimous jury instruction. *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020). Because the jury's verdicts were unanimous, we reject on harmless error grounds the assignments relating to structural error and the trial court's giving a nonunanimous jury instruction. *State v. Flores Ramos*, 367 Or 292, 320, 478 P3d 515 (2020) (holding that error in instructing the jury that it could return nonunanimous guilty verdicts did not require reversal of convictions rendered by unanimous guilty verdicts).

[2] The CARES interview asked:

"You know one other thing I sometimes talk to girls about, [J], is maybe there was a time when somebody like touched them on private parts or was messing with them or did things like that. Did that ever happen to you?

"[J]: No."

night before a visit, J announced at dinner, "My dad sexually abused me." J's grandmother asked her to explain and, when J looked uncomfortably toward her grandfather, the grandfather left the room. J then told her grandmother that defendant had made her watch pornography and lick his penis and had also licked her "private area." The grandmother, who is a mandatory reporter, reported the disclosure to the children's DHS caseworker. Defendant did not come for the scheduled visit the next day and has not had any visits with J since.

On November 30, 2015, CARES interviewed J regarding her allegations of sexual abuse. In the interview, J graphically described regular sexual abuse by defendant before she moved in with her grandparents.[3] She talked about seeing pornography when defendant was watching and described the knife incident and the choking incident. Defendant was charged with multiple counts of sexual abuse, as well as strangulation and criminal mistreatment.

At trial, the state sought to admit a video of the November 30, 2015, CARES interview but to exclude a video of the May 2015 interview. Defendant contended that if the court admitted the November video, it should also admit the May video, for purposes of impeachment. Defendant later asserted that the May video was also admissible for its substance, as statements made for purposes of medical diagnosis. OEC 803(4) (stating hearsay exception for statements made for purposes of medical diagnosis or treatment); OEC 613 (describing admissibility of extrinsic evidence of witness's prior inconsistent statement).

---

[3] J told the interviewer, "I was sexually abused * * * [b]y my father." J said that the abuse would take place in the living room. Defendant would wake her up when her mother was either sleeping or at work. She explained, "He forced me to lick his penis, and he was licking my private part." She said that he would "suck" on her "vagina," and that her "pants were pulled down but not off, but my shirt was still in the same place." She said, "He like put my head down and then he forced me to suck on his penis." "Until the icky stuff came out. I had to spit it out." She said it tasted "Sour, tart." Then, she said, defendant "wiped it all up and then he just put me back in bed" and she thought "[t]hank God I'm not doing this anymore." But the abuse continued to occur: "But then—the next day he did it and then the day after that and then and then and then and then and then." She said it was always the "[s]ame as the first time." She said that the abuse occurred "lots" and "mostly everyday."

The court initially decided to admit most of the November video substantively, but only portions of the May video for impeachment purposes only. The court instructed the jury on its consideration of evidence admitted only for impeachment.

The court later determined that the May video was admissible under the medical diagnosis exception to hearsay, OEC 803(4), but nonetheless, under OEC 403[4] excluded the same portions of the May interview video that the court had previously excluded. The court's rationale was that the excluded portions were potentially confusing to the jury because of the interview's focus on domestic violence rather than sexual abuse. The court did not amend its instruction regarding the jury's consideration of the May interview only for purposes of impeachment.[5]

J was age nine at the time of trial. She testified and described the alleged sexual abuse in detail.[6] Defendant's theory of the case was that J had made up the allegations of sexual abuse so that she would not have to attend more frequent visits with him, because she was afraid of him. Thus, the defense depended on a determination that J had a motive to lie, that J's allegations were not credible, and that the sexual abuse did not occur. The jury reached guilty

---

[4] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

[5] Defendant challenges on appeal, but did not preserve as error below, the giving of that instruction.

[6] J testified that that defendant touched her "crotch" in a way that she did not want him to, that he used "[h]is mouth," and "[i]t felt really icky." She also said that "[h]e made me touch his crotch" with "[m]y mouth," she had to "[s]uck on it," and it felt "icky." She said "[s]omething wet" came out of his "crotch," "it went on the bed, but then eventually it went in my mouth." She also testified, "He made me swallow it." She testified that the abuse happened when her mother was at work or asleep. She said it occurred, "about every day." She said there was a futon in the living room. She said, "it started very often, but then eventually it got less times, and then it stopped." She testified that defendant woke her up to do those things and gave her coffee or had her smoke pot to wake her up. She said that she did not tell anyone sooner about the abuse because "I was worried he would hurt me." She eventually told her paternal grandmother, "Because I was living with her at the time, and knew that I was safe."

verdicts on multiple counts of sexual abuse as well as one count each of strangulation and criminal mistreatment.

Defendant asserts in his first assignment of error that the court should not have excluded portions of the May interview under OEC 403, because the entire interview was highly probative of J's credibility. That is because, defendant contends, certain events that J described in excluded portions of the interview—such as incidents of domestic violence—were undisputed or separately confirmed by other witnesses and would have allowed the jury to assess J's demeanor when being truthful, as compared with her demeanor in the November interview and on the witness stand, in which she described the sexual abuse.[7] That evidence, defendant contends, would have aided the jury in determining whether J was being truthful in accusing defendant of sexual abuse.

The portions of the May interview that the court admitted consist of seven transcript pages of general conversation between J and the interviewer on how the interview would be conducted, five transcript pages of discussion about an incident in which defendant threatened to stab his wife with a knife, and the interviewer's question about sexual abuse and J's one-word response.

The portions of the interview that defendant asserts should also have been admitted consist of six transcript pages of J's general description of her family life, a four-page discussion of defendant's "tantrum" in response to the grandmother taking the children to her house one day when J's mother was sick, J's four-page description of an incident in which defendant punched J's mother in the eye, and a few pages in which J described her mother's and grandparents' use of marijuana.

The state argued that the excluded portions were cumulative and created the possibility of confusing the jury

---

[7] Additionally, defendant contended at oral argument that the entire interview was admissible for multiple purposes, as substantive evidence, as demeanor evidence, and as impeachment evidence. The state argues that there are preservation problems, but it is clear that the court considered the issues raised by defendant on appeal, with the exception of the argument concerning the jury instruction.

by drawing its focus away from the charged crimes. Those are legitimate bases for exclusion. OEC 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of *** confusion of the issues *** or needless presentation of cumulative evidence."). In exercising its discretion, the trial court was thus required to weigh the probative value of the evidence against the extent to which it might have been cumulative or confused the jury in its assessment whether defendant committed the charged acts of sexual abuse. *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987). The trial court agreed with the state that the evidence was cumulative and that there was a possibility that it would confuse the jury.

We review the trial court's ruling to assess whether it "falls within the range of legally permissible choices." *State v. Gibson*, 299 Or App 582, 589, 451 P3d 259 (2019), *rev den*, 366 Or 691 (2020). After an examination of the record, we conclude that the excluded portions of the May interview had minimal probative value as to the charged crimes themselves and as to J's credibility with respect to the charged crimes. Additionally, any probative value as to J's credibility was cumulative of evidence that the court did admit. In the admitted portions of the May interview, and in the November interview and her trial testimony, J described incidents or events that were not disputed or that were independently confirmed by other witnesses and from which the jury could assess J's demeanor when being truthful. Defendant did not assert that J's demeanor during the excluded portions of the May interview was different from her demeanor in the admitted portions of the May interview or her demeanor in the November interview or at trial.

Additionally, the risk of confusion, although minimal, was real. In the May interview, J did not discuss any of the alleged sexual abuse. The jury could have been confused as to why J's descriptions of defendant's abusive conduct toward his wife had any bearing on defendant's guilt of the charged crimes. We have reviewed the record and conclude that the trial court did not abuse its discretion in determining that, under OEC 403, those portions of the video of the May interview identified by defendant should be excluded.

Even if we were to conclude that the trial court abused its discretion in excluding portions of the May interview under OEC 403, or erred in instructing the jury to limit its consideration of the admitted portions to impeachment, we would conclude that any abuse of discretion or error was harmless. There was a substantial quantity of evidence in the record, including the admitted portions of the May interview, the November interview, and J's testimony on the witness stand, from which the jury could assess J's general credibility as to the allegations of sexual abuse, and there was little likelihood that the exclusion of the additional minimally probative evidence affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003) (The test for harmlessness is whether there is little likelihood that the particular error affected the verdict.); OEC 103 (evidentiary error is not presumed prejudicial and error may not be predicated upon a ruling to admit or exclude evidence unless a substantial right has been affected). For the same reasons, we reject defendant's due process contention relating to the exclusion of portions of the May interview. *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (A federal constitutional error is harmless, such that the conviction will be upheld, "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.").

We turn to defendant's second assignment, asserting that the trial court erred in excluding testimony describing an unusual disclosure of sexual abuse by J. J was living with her grandparents on Thanksgiving Day 2015. Andre Jones, the respite caregiver for J's brother and a friend of the family, knew J "pretty well," and spent the day with the family. In an offer of proof, Jones testified that he was watching television when J came out of her bedroom, walked up to him, and announced, "My dad sexually abused me." Jones testified that the statement was made in a very conversational way, and that J did not seem distressed. He described the disclosure as "very strange." In support of the testimony, defendant argued that it was not offered for the truth of the words, but as an example of J using adult words that a child her age would not know and delivering them "in a manner that is inconsistent with someone that

is describing events." Defendant argued that the testimony would have shown that the disclosure "was not something she is hesitant about" and that the words and manner of delivery were inconsistent with the presentation made to the grandmother and the CARES interviewer. Defendant sought to introduce the evidence as an example of J's cavalier attitude toward her sexual abuse allegations and in support of defendant's theory that J made up the allegations to avoid increased contact with him. The state objected that the evidence was hearsay and that it could not be offered as impeachment because it was not inconsistent with J's other disclosures.

The court viewed the statements as hearsay and not amendable to any hearsay exception. In his second assignment of error, defendant contends that the evidence was admissible for its relevance in assessing J's credibility. Defendant asserts that the words used in the disclosure and the manner in which they were delivered "are inconsistent with sexual abuse and more consistent with a child providing information that would extricate her from a dangerous situation," *i.e.*, increased visits with defendant.

The state concedes that the trial court erred in determining that the evidence was inadmissible hearsay but argues that the error in excluding it was harmless, because the jury had an adequate opportunity to assess J's credibility from other evidence. The state further asserts that the error was harmless, because the Jones evidence was substantially similar to other evidence from which the jury could assess J's demeanor and credibility during her disclosures of abuse.

Defendant responds that the error in excluding the evidence was not harmless, because J's statement to Jones, including the words that she used and the manner in which she delivered them, was relevant to her credibility. In defendant's view, it provided evidence of a different view of J's attitude toward her disclosure that the jury had not seen. Defendant contends that the evidence was important, because it was not consistent with other reports and evidence of J's demeanor when she was talking about the abuse, and it tended to support defendant's theory of the case that J

made up the accusations to avoid having to visit with defendant. Because defendant's theory of the case rested on J's credibility, defendant contends, any evidence shedding light on J's credibility likely affected the verdict.

Assuming *arguendo* that the trial court erred in excluding the evidence, we agree with the state's contention that any error in excluding the evidence was harmless.[8]

As we recently said in *State v. Simon*, 294 Or App 840, 849, 433 P3d 385, *rev den*, 365 Or 502 (2019), evidentiary error is not presumed to be prejudicial. A defendant seeking a reversal based on a claim of evidentiary error has the burden to show some likelihood that the challenged evidence affected the verdict. *Id.* (citing *Davis*, 336 Or at 32, and OEC 103(1)). In making the determination on the potential prejudice of excluding relevant evidence, the court evaluates the quality of the erroneously excluded evidence as compared with other evidence admitted on the same issue, in the context of the record as a whole. The erroneous exclusion of evidence that is "merely cumulative" of admitted evidence and not "qualitatively different" from admitted evidence is generally harmless. *State v. Klein*, 352 Or 302, 314, 283 P3d 350 (2012) (citing *Davis*, 336 Or at 34).

Defendant contends that the disclosures to Jones were different from her disclosures to others. We agree with the state that, contrary to defendant's contention, the evidence of J's statement to Jones was not qualitatively different from other similar admitted evidence that allowed the jury to assess the manner in which J disclosed the alleged abuse as it had a bearing on her credibility. There were no inconsistencies that implied fabrication. At best, Jones's testimony was cumulative of other evidence that was also immaterial to or marginally relevant to J's credibility. Like the disclosure to her grandparents, the disclosure to Jones was made in the family home, to a person with whom J had

---

[8] We question the materiality of the evidence with respect to an assessment of J's credibility, the purpose for which defendant asserted the evidence was admissible. As noted, defendant asserted that J fabricated the accusations of abuse to avoid having additional supervised visits with defendant because she feared him, but the evidence for that motive was scant to speculative, and the Jones testimony did not bear on it."

a relationship through family. Like the disclosures to her grandparents and to CARES, J used "adult" terminology—"sexual abuse"—which defendant contends would not be age-appropriate. Like her first disclosure to the family at the dinner table, J's declaration to Jones came from "out of the blue" and was made in a matter-of-fact way. Like the disclosure to the family and to CARES, rather than using defendant's nickname, J referred to defendant as her "dad" or "father." Like the disclosures to the family and to CARES, J's statements to Jones were made in a calm manner.

The only distinction in the way J disclosed the abuse to Jones was her sudden appearance from and return to her bedroom. Given defendant's particular theory for which the evidence was offered—to show that J had a motive to lie and to cast doubt on J's credibility—we conclude that that slight difference, viewed in the context of the record as a whole, would not likely have affected the verdict. *See Klein*, 352 Or at 314-15 (even where erroneously excluded testimony did not demonstrate "exactly the same thing" as properly admitted testimony and "would have provided a different perspective and a different emphasis than" the properly admitted testimony, the error was harmless "because the jury heard the same facts" through properly admitted evidence); *Davis*, 336 Or at 32 (erroneous exclusion of evidence could have affected the verdict when the excluded evidence demonstrated facts, not otherwise in evidence, that supported defendant's theory of the case).

We note, additionally, that the Supreme Court has held that an error in excluding evidence relevant to credibility is harmless if the jury has had an adequate opportunity to assess the witness's credibility. *State v. Titus*, 328 Or 475, 482, 982 P2d 1133 (1999). As discussed above in the context of the first assignment, the jury had a significant quantity of evidence from which to assess J's credibility in disclosing the abuse. The jury could assess J's credibility from her grandmother's description of the disclosure, from J's testimony at trial (including her detailed descriptions of the abuse), and from J's statements during the two CARES interviews. Viewing the record as a whole, there was no shortage of evidence from which the jury could assess whether J was lying when she disclosed and described the abuse. *See*

*State v. Hubbard*, 297 Or 789, 800, 688 P2d 1311 (1984) (the erroneous exclusion of impeachment evidence "is reversible if it denies the jury an adequate opportunity to assess the credibility of a witness whose credibility is important to the outcome of the trial"); *State v. Starr*, 269 Or App 97, 109, 344 P3d 100, *rev den*, 357 Or 415 (2015) (in assessing harmlessness, the court considers all the evidence at trial); *State v. Torres*, 206 Or App 436, 445, 136 P3d 1132 (2006) (An evidentiary error affects a defendant's substantial rights when, based on the totality of the record, the error affected the jury's verdict.).

In summary, we conclude that the admitted evidence that the jury had before it demonstrated the same facts relative to J's credibility that defendant sought to establish from the Jones evidence, that the Jones evidence was qualitatively similar to other evidence of J's disclosures, and that the additional probative value of the Jones evidence for the purpose of assessing J's credibility would have had been minimal. For all those reasons, we conclude that there is little likelihood that the exclusion of the Jones evidence affected the jury's verdict. We conclude, therefore, that any error by the trial court in excluding the evidence was harmless.[9]

In his third assignment, defendant contends that the trial court erred in denying defendant's motion for mistrial after learning that, shortly after the jury had been selected, Juror 11 joked in the jury room, "We could just make our job easier. We could just take a vote now," causing people to laugh. The juror repeated the comment to the bailiff, who reported it to the judge after a morning of testimony from J.

The court took the matter seriously, conducting an investigation that lasted the better part of a day. The court interviewed each juror, asking their reactions to the comment and whether they thought they could be fair and

---

[9] We reject defendant's contention that he had a due process right to present the Jones testimony, which was consistent with defendant's defense theory. Defendant was not prevented from proving his defense. Rather, the trial court excluded evidence that had, at best, minimal relevance to his defense, that was redundant, and that did not add probative force.

impartial. Juror 11 said the remark had been a joke. Each juror stated that they could be fair and impartial. The court dismissed Juror 11 and replaced him with an alternate juror.

The court then instructed the jury extensively, reminding the jury of its oath to remain impartial and its obligation to consider all the evidence presented and not to discuss or deliberate on the case until all the evidence had been presented. The court then denied defendant's motion for a mistrial.

Defendant contends that the trial court abused its discretion in denying the motion for mistrial, *State v. Worth*, 231 Or App 69, 70, 218 P3d 166 (2009), *rev den*, 347 Or 718 (2010) (ruling denying mistrial motion is reviewed for abuse of discretion), because, in light of the impact of Juror 11's impact on other jurors, he could not possibly have had a fair trial. We have reviewed the record and conclude that the trial court did not abuse its discretion.

Affirmed.